IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 09-0146-TUC-FRZ(HCE) |
| Plaintiff, | **REPORT & RECOMMENDATION** |
| vs. | |
| Julio Ochoa-Mata, | |
| Defendant. | |

Defendant Julio Ochoa-Mata (hereinafter "Defendant") filed a Motion To Suppress Evidence (Doc. No. 27). Defendant moves to suppress: (1) statements made by Defendant regarding being in the United States illegally; and (2) 500 rounds of Aguila .380 ammunition. Defendant's Motion To Suppress Evidence came on for hearing on May 26, 2009 and June 2, 2009.[1]

For the reasons stated herein, the Magistrate Judge recommends that the District Court deny Defendant's Motion To Suppress statements made by Defendant and 500 rounds of Aguila .380 ammunition.

---

[1] The transcript of the May 26, 2009 hearing, wherein Immigration and Customs Enforcement (hereinafter "ICE") Agent Matthew Charles Loghry (hereinafter "Agent Loghry") and Border Patrol Agent Albert Ortiz (hereinafter "Agent Ortiz") testified was filed on June 2, 2009 (Doc. No. 55). The transcript of the June 2, 2009 hearing wherein Agent Ortiz, Douglas Police Officer Paul Barco (hereinafter "DPO Barco") and Alcohol, Tobacco and Firearms Agent Paul Brostko (hereinafter "Agent Brostko") testified was filed on June 9, 2009 (Doc. No. 60).

# I. PROCEDURAL AND FACTUAL HISTORY

## A. Charge

Defendant is charged in one count of a two count indictment[2] with having been previously convicted of a crime punishable by imprisonment of a term exceeding one year, i.e., Possession of Pseudoephedrine With Intent to Manufacture Methamphetamine in case number F055909068-9 in the Superior Court of California, County of Fresno, on February 22, 2006, and knowingly possessing 500 rounds of Aguila .380 caliber ammunition on or about January 10, 2009, at or near Tucson, in the District of Arizona, said ammunition being in and affecting interstate commerce in that it was previously shipped and transported into the State of Arizona from another state or foreign country, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. No. 6).

## B. Procedural History

Defendant's Motion To Suppress came on for hearing on May 26, 2009 and June 2, 2009. Agent Loghry and Agent Ortiz testified on May 26, 2009. The hearing was continued to June 2, 2009 wherein Agent Ortiz continued his testimony followed by the testimony of DPO Barco and Agent Brostko. Admitted into evidence were Government Exhibit 1, a Department of Public Safety (hereinafter "DPS") traffic citation issued to Co-Defendant Silvestre Cervantes-Contreras (hereinafter "Co-Defendant" or "driver") for failing to stop at a stop sign; and Government Exhibit 2, a Consent to Search form signed by the Co-Defendant.

## C. Factual Background

### 1. Observations At The Gun Show

Agent Loghry, who is a fluent Spanish speaker, has been an ICE agent for 1½ years and previously was a Border Patrol Agent for 3½ years. (Agent Loghry Testimony, May 26,

---

[2] Co-Defendant Silvestre Cervantes-Contreras is charged in Count 2 with being in the United States illegally and in possession of 1,000 rounds of Aguila .380 super caliber ammunition in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2). Defendant Cervantes-Contreras pled guilty on May 29, 2009 and is presently pending sentencing before the District Court on August 12, 2009.

2009 (Doc. No. 55), at pp. 7, 16, hereinafter "Loghry at p. __") On January 10, 2009 Agent Loghry was working in an undercover capacity at the Crossroads of the West gun show held at the Pima County Fairgrounds. (Loghry at p. 9). He was investigating violations such as "straw"[3] purchases of firearms and/or ammunition and prohibited possessors which include convicted felons, illegal aliens, fugitives, persons convicted of domestic violence, and drug users. (*Id.* at pp. 10-11).

Agent Loghry's attention was drawn to two men and a woman. (*Id.* at p. 12). The woman was pointing out a weapon she apparently liked and it appeared to Agent Loghry that the men might purchase it for her. (*Id.* at pp. 12-13). Agent Loghry suspected that a "straw" purchase of the weapon might occur. (*Id.* at p. 30). The weapon was not purchased and Agent Loghry was called to conduct surveillance elsewhere. (*Id.* at p. 13). Agent Loghry's attention was brought back to the two men and woman thirty minutes later when he overheard the two men speaking to a vendor in Spanish. (*Id.* at p.15). The topic of their conversation was the purchase of ammunition. (*Id.*). He observed each man pull a large amount of currency from their respective front pants pocket. (*Id.* at p. 17). Although there is nothing illegal about carrying currency in one's front pants pocket and many people do purchase weapons and/or ammunition with cash, in Agent Loghry's experience, most people carry currency in their wallet. (*Id.* at pp. 17, 27).

Both men handed the vendor currency and both men were observed to each take a case of ammunition. (*Id.* at p. 18). The two men and woman were observed leaving the gun show, and approximately thirty seconds later, they joined another woman who was pushing a stroller. (*Id.* at pp. 18-19). Both men placed their respective case of ammunition to the rear and below where a child sits in the stroller. (*Id.* at p. 19). The two men and two women were observed walking north to a parked gray sedan. (*Id.* at pp. 19-20). Agent Loghry observed the trunk of the gray sedan being opened, the two cases of ammunition and stroller being

---

[3] A "straw" purchase is when a legally authorized person buys a weapon or ammunition for another not legally authorized to do so. (Loghry at p. 10; Agent Brostko Testimony, June 2, 2009 (Doc. No. 60), at pp. 59-60).

placed therein, and the two men and two women getting into the gray sedan. (*Id.* at pp. 20-21).

Agent Loghry contacted a lookout post and other ICE agents about what he had observed and what he suspected. (*Id.* at p.21). What he suspected was that an illegal purchase had been made by a prohibited possessor, i.e., either an illegal alien or an alien "out of status."[4] (*Id.*). He asked the lookouts to look for the gray sedan. (*Id.* at pp.21-22). Agent Loghry is not sure whether Agent Brostko was one of the agents contacted, but is sure DPO Barco and Agent Ortiz were not. (*Id.* at p. 32). Whomever answered the phone at the lookout post relayed the information to other agents in the field. (*Id.*).

**2. Observations Of A Sedan**

Agent Ortiz, who is fluent Spanish speaker, has been a Border Patrol Agent for nine years. (Agent Ortiz Testimony, May 26, 2009 (Doc. No. 55), at pp. 33, 55, hereinafter "Ortiz I at p. __"). On January 10, 2009 he was cross-designated to work with DPS to enforce traffic laws. (Ortiz I at pp. 34-35; Agent Ortiz Testimony, June 2, 2009 (Doc. No. 60), at p. 4, hereinafter "Ortiz II at p. __"). In this capacity he has issued 30 to 40 citations ranging from speeding violations to stop sign violations to jaywalking violations. (Ortiz I at p. 35). Agent Ortiz works out of Douglas, Arizona, and on January 10, 2009 was assigned to the Tucson sector as a cross-designated DPS officer at the Crossroads of the West gun show being held at the Pima County Fairgrounds. (*Id.* at pp. 33, 41).

On January 10, 2009 Agent Ortiz was the driver of an unmarked 2007 brown Chevrolet Tahoe. (*Id.* at pp. 35-36, 43). Assigned as his partner and passenger that day was Agent Brostko. (*Id.* at p. 42). They were parked west of and ¾ of a mile north of the Pima County Fairgrounds on the north side of Rocket Stravenue, which runs east and west. (*Id.* at p.46). The vehicle was facing west approximately 30 yards east of the intersection of Rocket

---

[4]"Out of status" is an alien permitted to be in the United States but who is prohibited from purchasing weapons and /or ammunition e.g., a foreign tourist in the United States on a visa. A legal permanent resident alien, however, is permitted to purchase weapons and/or ammunition. (Loghry at pp. 21-22).

- 4 -

Stravenue and Rita Road, which runs north and south. (*Id.* at p. 45). Agents Ortiz and Brostko were parked at this location monitoring traffic. (*Id.* at pp. 45-46).

Agents Ortiz and Brostko had received a description via radio of a silver 4-door sedan with no other identifying[5] characteristics given. (*Id.* at p. 43). Information transmitted, according to Agent Ortiz' recollection, was that a subject had purchased ammunition. (*Id.* at p. 45). Agents Ortiz and Brostko confirmed with each other the information received. (*Id.* at pp. 44-45). Agents Ortiz and Brostko had been parked for approximately two hours when Agent Ortiz saw a vehicle that matched the description of the vehicle given him by radio transmission. (*Id.* at p. 46). It was unknown to Agent Ortiz whether the vehicle seen was the same vehicle described. (*Id.*).

The intersection of Rocket Stravenue and Rita Road is a T-intersection with through traffic north and southbound on Rita Road. (Ortiz I at p. 47). Agent Ortiz saw the silver sedan approach Rita Road, decrease speed, hesitate momentarily, signal and turn right while failing to stop at the stop sign, and continue north on Rita Road. (*Id.* at p. 47; Ortiz II at p. 23). There were no visual obstructions between Agent Ortiz' position and the stop sign. (Ortiz II at p. 22). Agent Ortiz drove the unmarked 2007 Chevrolet Tahoe he and Agent Brostko were in, onto Rocket Stravenue to follow and stop the silver sedan to cite the driver for violation of Arizona Revised Statute §28-855(B).[6] (*Id.* at p. 48).

Meanwhile, DPO Barco was in an unmarked 2007 Chevrolet Tahoe parked in a dirt parking lot approximately 40 yards southwest of the intersection of Rocket Stravenue and Rita Road with a clear view of the intersection. (DPO Barco Testimony, June 2, 2009 (Doc. No. 60), at pp. 36, 38, hereinafter "Barco at p. __"). DPO Barco and Agent Ortiz were in

---

[5] When Agent Loghry first observed the gray sedan with the trunk open he was unable to see the license plate because it was on the open trunk lid facing up. (Loghry at p. 27).

[6] "A driver of *a vehicle approaching a stop sign shall stop* before entering the crosswalk on the near side of the intersection, or if there is no crosswalk, *shall stop* at a clearly marked stop line, or if there is no line, *shall stop* at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection...." A.R.S. §28-855(B) (emphasis added).

1 radio communication and commented to one another that the silver sedan had rolled through the stop sign. (Barco at pp. 37, 52). DPO Barco had not received the earlier radio transmission to be on the lookout for the silver sedan. (*Id.* at p. 40). The silver sedan continued north on Rita Road and turned left to go west on an on-ramp onto Interstate 10. (Ortiz I at p. 49). Agent Ortiz followed the silver sedan and activated his vehicle's emergency lights. (*Id.*) The driver of the silver sedan responded by stopping on the right-hand shoulder of the on-ramp. (*Id.* at pp. 49-50). Agent Ortiz positioned his vehicle behind the silver sedan. (*Id.* at p. 63).

### 3. Contact With Defendant And Consent From Co-Defendant

Agent Ortiz approached the driver side of the silver sedan while Agent Brostko approached the passenger side. (*Id.* at p. 51). There were five occupants in the silver sedan: a male driver, a female sitting in the front passenger seat, a female sitting in the backseat behind the driver, a male sitting in the backseat on the passenger side, and a child[7] in a car seat. (Ortiz II at pp. 15-20).

Agent Ortiz identified himself as a police officer and asked the driver in English to provide him with a driver's license, registration and proof of insurance. (*Id.* at p. 52). The driver, identified as Co-Defendant herein, asked Agent Ortiz to please repeat himself in Spanish, which Agent Ortiz did, at which time the driver produced a Mexican driver's license. (*Id.* at pp. 52-53). Agent Ortiz queried the driver regarding his citizenship and was told he was born in Mexico. (*Id.* at pp. 53-54). Agent Ortiz then identified himself as a Border Patrol agent and asked the driver for documentation authorizing him to be or remain in the United States. (*Id.* at p. 54). The driver first told Agent Ortiz that he had immigration documents but not on his person. (*Id.*) Agent Ortiz told the driver that it was a violation of his immigration status to fail to carry those documents, at which time the driver recanted and informed Agent Ortiz that he did not have any immigration documents. (*Id.* at p. 55). Agent

---

[7]There was a one-year old infant in a child seat in the backseat of the silver sedan whose father was the driver and whose mother was the front seat passenger. (Loghry at pp. 58-59).

1  Ortiz thus determined that the Co-Defendant was in the United States illegally. (Ortiz I at
2  p. 60; Ortiz II at p.16). The questioning of the driver lasted less than a minute. (Id.).

3  Agent Ortiz addressed the male in the backseat, identified as Defendant herein, regarding
4  his citizenship to which Defendant responded that he was a citizen of Mexico. (*Id.* at pp. 56-
5  57). Agent Ortiz asked Defendant whether he had documents authorizing him to be or remain
6  in the United States, to which Defendant responded that he did not. (*Id.* at p. 57). Agent Ortiz
7  thus determined that Defendant was in the United States illegally. (*Id.*). The female in the
8  front passenger seat was determined to be in the United States illegally and was the driver's
9  girlfriend. (*Id.*) The female sitting on the driver side back seat was determined to be a U.S.
10 citizen and the driver's aunt. (*Id.* at p. 58). In total, it took Agent Ortiz two minutes to
11 question the Defendant and two female occupants of the silver sedan regarding their
12 respective citizenship. (*Id.* at pp. 59-60).

13 Other law enforcement personnel began to arrive in their own vehicles. (*Id.* at pp. 60-61).
14 DPO Barco arrived in an unmarked DPS vehicle and parked behind Agent Ortiz' vehicle. (*Id.*
15 61). Agent Ortiz brought the Co-Defendant driver of the silver sedan to DPO Barco's vehicle
16 while Agent Brostko took Defendant to a point 20 yards away. (*Id.* at pp. 62-63). The
17 driver's aunt, who remained in the silver sedan back seat, was attempting to get Agent Ortiz'
18 attention. (*Id.* at p. 64). When Agent Ortiz responded to her, she told him that she was going
19 to be late for work and asked "if [he] could just let them go." (*Id.*).

20 Agent Ortiz asked the aunt where they were coming from to which she responded they
21 were coming from the gun show. (*Id.*). He queried her further regarding whether "they had
22 purchased anything at the gun show" to which she responded "they had purchased some
23 ammunition" with money given to "them" by her. (*Id.*). When asked who "they" were, she
24 pointed to Defendant and Co-Defendant. (*Id.* at p. 65) When asked whom the ammunition
25 was for, she responded that the ammunition was for herself. (*Id.*). When asked the caliber and
26 brand of the ammunition, the aunt was unable to provide that information. (*Id.*). When asked
27 again by Agent Ortiz whether the ammunition was for her, the aunt looked away and nodded
28 her head "no." (*Id.*). The aunt further informed Agent Ortiz that the two men who had been

1  in the silver sedan had actually purchased the ammunition. (*Id.*). Agent Ortiz queried the aunt
2  regarding ownership of the silver sedan and, she stated it belonged to the Co-Defendant.
3  (*Id.*). Agent Ortiz returned to his vehicle and confirmed through a records check that the
4  vehicle was registered to the Co-Defendant. (*Id.* at pp. 65-66).

Agent Ortiz then approached the Co-Defendant driver at DPO Barco's vehicle and asked him whether he would give consent to a search of his vehicle. (*Id.* at p. 66). Agent Ortiz provided the Co-Defendant with a DPS consent form written in both English and Spanish, gave the Co-Defendant an opportunity to read it, and Agent Ortiz explained it to him. (*Id.*). Agent Ortiz read the Spanish-written part of the form to the Co-Defendant and asked him whether he understood the form, to which he replied that he did. (*Id.* at pp. 66, 69; Barco at p.44). Agent Ortiz then asked the Co-Defendant to sign the form if he was willing to give consent to search his vehicle. (Ortiz I at p. 66). The Co-Defendant signed the Spanish-written portion of the consent form above Agent Ortiz' and DPO Barco's signatures. (*Id.* at p. 68; Government Exhibit 2; Barco at p. 45). A search of the vehicle resulted in finding two cases of ammunition in the trunk. (Ortiz I at pp. 71-72).

## **II. ANALYSIS**

### **A. The Stop**

When law enforcement conducts a traffic stop, the driver of the vehicle stopped as well as any passenger therein, have been seized for Fourth Amendment purposes and may challenge the stop's constitutionality. *Brendlin v. California*, 551 U.S. 249 (2007). Defendant's argument, as a passenger in the Co-Defendant's silver or gray sedan, is that law enforcement's claim of a stop sign violation in order to stop the vehicle was pretextual and the ulterior motive was to investigate the suspected purchase of ammunition by a prohibited possessor. It is well-established that ulterior motive does not in and of itself deprive law enforcement of otherwise legal justification or lawful conduct. *See United States v. Villamonte-Marquez*, 462 U.S. 579, 584, n. 3 (1983); *Scott v. United States*, 436 U.S. 128, 136 (1978). *United States v. Robinson*, 414 U.S. 218, 221, n. 1 (1973); *Gustafson v. Florida*, 414 U.S. 260 266 (1973). The stop of the Co-Defendant, herein, was not a *random* traffic

1  stop affording police intrusion without probable cause. Rather, the stop of the Co-Defendant
2  was based on probable cause from an *observed* violation of a traffic regulation. *Whren v.*
3  *United States*, 517 U.S. 806, 817 (1996). Probable cause exists "when police officers have
4  facts and circumstances within their knowledge sufficient to warrant a reasonable belief that
5  the suspect had committed or was committing a crime." *United States v. Fouche*, 776 F.2d
6  1398, 1403 (9th Cir. 1985), *overruled on other grounds, California v. Hodari D.,* 499 U.S.
7  621 (1991). Moreover, "[t]he fact that the alleged traffic violation is a pretext for the stop is
8  irrelevant, so long as the *objective circumstances* justify the stop." *United States v. Wallace*,
9  213 F.3d 1216, 1299 (9th Cir. 2000)(emphasis added).

The objective circumstances justifying the stop herein are: (1) Agent Ortiz was alerted by radio transmission to a general description of a vehicle by color (silver) and model (sedan) (Ortiz I at p. 43); (2) Agent Ortiz was not given a specific identifying characteristic, such as a license plate for the vehicle, by radio transmission; (3) Agent Ortiz did not know if the silver sedan observed was the vehicle radio transmission had called about (Ortiz I at p. 46); (4) Agent Ortiz had an unobstructed view of the silver sedan as it rolled through the stop sign (Ortiz I at p. 47; Ortiz II at pp. 22, 23); (5) DPO Barco had not received the vehicle alert by radio transmission (Barco at p. 40; Loghry at p.32); (6) DPO Barco from a different vantage point observed the silver sedan roll through the stop sign (Barco at pp. 36-38, 52); (7) DPO Barco's exclusive duty assignment on January 10, 2009 was to enforce traffic regulations. (Barco at p. 52).

The stop of the silver sedan, herein, based on probable cause to believe that the driver failed to stop at a stop sign, in violation of A.R.S. §28-855(B), was reasonable for purposes of the Fourth Amendment. *Whren*, 517 U.S. at 810; *Delaware v. Prouse*, 440 U.S. 648 (1979).

**B. The Questioning Of The Co-Defendant And Defendant**

Herein, Agent Ortiz observed a stop sign violation by the Co-Defendant driver of the silver sedan. Agent Ortiz conducted a traffic stop of the vehicle. Agent Ortiz was cross-designated to enforce traffic laws. A driver of a vehicle is required to have a registration card

in the driver's compartment. *See* A.R.S. §28-2158(C). A driver of a vehicle is required to have a legible driver's license in his possession while driving. *See* A.R.S. §28-3169(A). Agent Ortiz is obligated to "[r]equire and [the driver of the vehicle] shall produce evidence of financial responsibility." A.R.S. §28-4134(A)(2); *see also* A.R.S. § 28-4135(B).

Agent Ortiz asked the driver of the silver sedan for his driver's license, registration and proof of insurance. (Ortiz I at p. 52). The driver in turn asked Agent Ortiz to repeat his query in Spanish, and upon doing so the driver produced a Mexican driver's license. (*Id.* at pp. 52-53). Seeing the Mexican driver's license prompted Agent Ortiz to ask of the driver where he was born and the driver responded he was born in Mexico. (*Id.* at pp. 53-54). This in turn prompted Agent Ortiz to identify himself as a Border Patrol agent and inquire of the driver whether he had documents permitting him to be or remain in the United States. (*Id.* at p. 54). The driver stated he did have such documentation but not on his person. (*Id.*). This in turn prompted Agent Ortiz to advise the driver that it was a violation to fail to have such documents on his person while in or remaining in the United States. (*Id.*). The driver then admitted to not having any documentation and Agent Ortiz arrested him for being in the United States illegally. (Ortiz I at p. 60; Ortiz II at p.16). This questioning of the driver took less than a minute. (*Id.* at p. 55).

Agent Ortiz' questions of Defendant regarding citizenship and whether he had documentation authorizing him to be or remain in the United States was valid. "The police may ask people, who have legitimately been stopped, for identification without conducting a Fourth Amendment search and seizure." *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007), *cert. denied,* __ U.S. __, 128 S.Ct. 634 (2007); *see INS v. Delgado*, 466 U.S. 210, 216 (1984)("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."). The questioning of Defendant, Co-Defendant and the two female passengers took no more than three minutes. (Ortiz I at pp. 59-60).

The duration of the stop in this case was reasonable and justified by the observed traffic offense and the ordinary inquiries associated with such a stop. *Illinois v. Caballes*, 543 U.S.

1  405, 408 (2005). The U.S. Supreme Court has expressly rejected the notion that a "'shift in
2  purpose' 'from a lawful traffic stop into...[another] investigation' was unlawful because it
3  'was not supported by any reasonable suspicion.'" *Muehler v. Mena*, 544 U.S. 93, 101
4  (2005)(*quoting Caballes*, 543 U.S. at 408)). *See also United States v. Turvin*, 517 F.3d 1097,
5  1099-1100 (9th Cir. 2008). Under the instant circumstances, no additional Fourth
6  Amendment justification for inquiring about Defendant's immigration status was required.
7  *Id.*

8  Defendant not having been seized for purposes of the Fourth Amendment, no Fifth
9  Amendment *Miranda* advisement was necessary. Consequently, statements made by
10 Defendant in response to questions regarding his identity and legality of status in the United
11 States cannot be suppressed.

### C. Search Of The Vehicle

13 As a passenger of a vehicle, Defendant has standing to challenge the stop of such vehicle
14 on Fourth Amendment grounds. *Brendlin*, 551 U.S. 249. However, because Defendant does
15 not have a possessory or ownership interest nor a legitimate expectation of privacy in the
16 silver sedan, he does not have standing to challenge the search conducted of the silver sedan.
17 *United States v. Silva*, 247 F.3d 1051, 1055 (9th Cir. 2001); *United States v. Kovac*, 795 F.2d
18 1509, 1510-11 (9th Cir. 1986); *see United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir.
19 2000).

20 Defendant's argument that "the statement regarding being in the country illegally tainted
21 the probable cause to search the vehicle", (Defendant's Motion To Suppress Evidence, at p.
22 3 (Doc. No. 27)), is incorrect. Defendant's statements that he was a Mexican citizen with no
23 documentation to be in or remain in the United States prompted his arrest for being in the
24 United States illegally. It is the Co-Defendant's aunt's vacillating statements regarding the
25 true purchasers of ammunition that prompted Agent Ortiz to ask for and obtain consent to
26 search the vehicle from the Co-Defendant registered owner. The Fourth Amendment test for
27 a valid consent to search is not probable cause but that the consent given is voluntary. *Ohio*
28 *v. Robinette*, 519 U.S. 33, 40 (1996).

## III. CONCLUSION

For the above-stated reasons, Defendant has standing to challenge the stop of the vehicle in which he was a passenger. However, such challenge is foreclosed because law enforcement herein had probable cause to lawfully stop the vehicle for an observed traffic violation. Questioning of Defendant regarding his immigration status did not implicate the Fourth Amendment and did not require that Defendant be advised of his *Miranda* rights. Moreover, Defendant does not have standing to challenge the consensual search of the vehicle in which he was a passenger, lacking a possessory or ownership interest as well as a legitimate expectation of privacy therein.

## IV. RECOMMENDATION

The Magistrate Judge recommends that the District Court deny Defendant's Motion To Suppress Evidence (Doc. No. 27) of: (1) statements given by Defendant prior to his arrest for being in the United States illegally; and (2) ammunition seized as a result of a consensual search of the vehicle in which he was a passenger.

Pursuant to 28 U.S.C. §636(b) and Rule 59 of the Federal Rules of Criminal Procedure, any party may serve and file written objections within ten days after being served with a copy of the Report and Recommendation. If objections are filed, the parties should use the following case number: **CR 09-0146-TUC-FRZ.**

Failure to file objections in accordance with Fed.R.Cr.P. 59 will result in waiver of the right to review.

DATED this 16th day of June, 2009.

_____
Héctor C. Estrada
United States Magistrate Judge